

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00492-CV

_____

GARY BRUCE PEEK, Appellant

V.

LINDA MAYFIELD, Appellee

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV12-04-254

Before Sudderth, C.J.; Kerr and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

## MEMORANDUM OPINION

Appellant Gary Bruce Peek (Bruce) appeals an interim judgment in this trust dispute. This is the second interlocutory appeal of the trial court's receiver appointment and the third appeal overall in this case. In two issues, Bruce contends that the trial court lacked subject-matter jurisdiction to appoint a receiver over the family trust and that the evidence is insufficient to support that appointment. We affirm the trial court's interim judgment.[1]

## I. Background

The first appeal in this case was taken from the trial court's judgment after a bench trial. *Mayfield v. Peek* (*Peek I*), 546 S.W.3d 253, 257–58 (Tex. App.—El Paso 2017, no pet.).[2] The El Paso Court of Appeals categorized the claims at issue as the Guardianship Claim, the Will Claim, and the Trust Claim. *Id.* at 256–57. The Guardianship Claim concerned the guardianship of Russell Peek. *Id.* at 257. The Will Claim concerned the probate of Dorothy Peek's will. *Id.* Russell and Dorothy are Bruce and appellee Linda Mayfield's parents. *Id.* at 256. The El Paso Court of Appeals reversed the trial court's judgment on the Will Claim and the Guardianship Claim and remanded

---

[1]The appellee raises what appears to be a counter-issue asserting that the trial court properly ordered interim relief. We need not address this counter-issue because we overrule appellant's issues and affirm the trial court's interim judgment. *See* Tex. R. App. P. 47.1.

[2]Originally appealed to this court, *Peek I* was transferred to the El Paso Court of Appeals by the Texas Supreme Court pursuant to its docket equalization efforts. *See* Tex. Gov't Code Ann. § 73.001.

those claims to be dismissed for want of jurisdiction because the county court at law had exclusive jurisdiction over the claims from its prior guardianship and probate proceedings. *Id.* at 264, 267.

The Trust Claim concerned Bruce's alleged fiduciary-duty violations as trustee of the Peek Family Revocable Living Trust (2000) (the Peek Trust), which was established by Russell and Dorothy. *Id.* at 256–57. The El Paso Court of Appeals also reversed the trial court's judgment on the Trust Claim and remanded the claim for a new trial, finding that the trial court had abused its discretion in refusing to hear the claim. *Id.* at 266.

After remand, the trial court held a bench trial on the Trust Claim and found that Bruce had breached fiduciary duties as the Peek Trust's trustee and unduly influenced Dorothy to transfer certain assets from the trust. The trial court issued an "Interim Judgment" appointing a receiver over the trust and ordering remedies for the breaches. Bruce filed an interlocutory appeal from the trial court's interim judgment. *Peek v. Mayfield* (*Peek II*), No. 02-20-00107-CV, 2021 WL 3205061, at *3 (Tex. App.—Fort Worth July 29, 2021, no pet.) (mem. op.). Although the parties asserted numerous issues on appeal, we determined that the trial court's interim judgment failed to require a bond for the receivership. *Id.* at *5. Thus, we reversed the interim judgment's receiver appointment and remanded the case. *Id.*[3]

---

[3] *See Peek II*, 2021 WL 3205061, at *1–3, for a full procedural and factual history.

After the second remand, Linda died, and her daughter Lainie Latshaw filed a suggestion of death notifying the trial court that she would prosecute the claims as the executor of Linda's estate under Texas Rule of Civil Procedure 151. *See* Tex. R. Civ. P. 151 (permitting an executor to be substituted for decedent and pursue claims brought by plaintiff before she died).[4] She also filed a motion to re-appoint a receiver with a bond.

Bruce filed a motion to dismiss or, alternatively, to abate. According to Bruce's motion, the trial court lacked subject-matter jurisdiction because Linda's claims were related to the county court at law's probate of Dorothy's will, giving that court dominant jurisdiction. Bruce also filed an opposition to Linda's motion to re-appoint a receiver, reasserting his dominant-jurisdiction argument and arguing, among other things, that the trial court's interim judgment had been reversed in its entirety by our mandate in *Peek II*, that the evidence was legally and factually insufficient to support a receiver appointment, and that Linda's claims were barred by res judicata or collateral estoppel. Bruce also filed a supplemental answer, asserting additional affirmative defenses and specifically denying the trial court's jurisdiction because of the county court at law's dominant jurisdiction. The trial court denied Bruce's motion to dismiss or abate and issued an order appointing a receiver over the Peek Trust and requiring a $50,000 bond. This appeal followed.

---

[4]We will continue to refer to appellee as Linda for continuity with the parties' briefing and our prior opinion in this case.

## II. Discussion

Bruce asserts two issues on appeal. In his first issue, Bruce contends that the trial court lacked subject-matter jurisdiction over the Trust Claim because the county court at law has exclusive jurisdiction over all claims "challenging [the] distribution of estate assets" and the Trust Claim seeks to do just that. In his second issue, Bruce contends that the evidence is legally and factually insufficient to support the receiver's appointment. We address each issue in turn.

### A. Subject-Matter Jurisdiction

In the prior appeals, Bruce argued that the trial court was barred from hearing Linda's Trust Claim because the county court at law had dominant jurisdiction. *See Peek I*, 546 S.W.3d at 255; *Peek II*, 2021 WL 3205061, at *3. Bruce also raised dominant jurisdiction in the trial court after both the first and the second remands. *See Peek II*, 2021 WL 3205061, at *2; *supra* Section I. Both times, he asserted that the county court at law's dominant jurisdiction deprived the trial court of subject-matter jurisdiction over the Trust Claim. *See Peek II*, 2021 WL 3205061, at *2; *supra* Section I. As we explained in *Peek II*, however, dominant jurisdiction does not implicate a court's subject-matter jurisdiction but is more of a venue issue that cannot be raised by interlocutory appeal from a receiver's appointment. *Peek II*, 2021 WL 3205061, at *3–4 & n.2. Bruce now contends that the trial court lacked subject-matter jurisdiction because the county court at law had exclusive jurisdiction over the Trust Claim.

### 1. Applicable Law and Standard of Review

Subject-matter jurisdiction is essential to the authority of a court to decide a case. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). It "cannot be waived or conferred by agreement and can be raised at any time, including in an interlocutory appeal." *Bookout v. Shelley*, No. 02-22-00055-CV, 2022 WL 17173526, at *3 (Tex. App.—Fort Worth Nov. 23, 2022, no pet.) (mem. op.) (internal quotation marks omitted) (quoting *Anderson v. Truelove*, 446 S.W.3d 87, 91 (Tex. App.—Houston [1st Dist.] 2014, no pet.)). Whether a trial court has subject-matter jurisdiction and whether a plaintiff has alleged facts that affirmatively demonstrate a trial court's subject-matter jurisdiction are questions of law that we review de novo. *City of Westworth Vill. v. City of White Settlement*, 558 S.W.3d 232, 239 (Tex. App.—Fort Worth 2018, pet. denied) (citing *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)).

### 2. Analysis

The El Paso Court of Appeals held in *Peek I* that the trial court had subject-matter jurisdiction over the Trust Claim. *Peek I*, 546 S.W.3d at 265. The court specifically held, "As to the Trust Claim, the Property Code authorized the 271st District Court to hear the issues raised." *Id.* Noting the county court at law's concurrent jurisdiction over certain trust disputes, the court further concluded that "the issue is not one of exclusive jurisdiction, but rather dominant jurisdiction." *Id.*

Bruce essentially contends that the El Paso Court of Appeals got it wrong. According to Bruce, the Trust Claim seeks not only to void transactions by which

6

Dorothy transferred certain assets from the Peek Trust several months before her death, but it also seeks to reverse asset distributions under Dorothy's will. Thus, Bruce contends that the Trust Claim is in reality a will contest over which the county court at law has exclusive jurisdiction. We disagree.

Subject to limited exceptions, "a district court has original and exclusive jurisdiction over all proceedings against a trustee and all proceedings concerning a trust." *Id.* (citing Tex. Prop. Code Ann. § 115.001(a)). These exceptions include determining facts affecting the administration, distribution, or duration of a trust; relieving a trustee of duties; and requiring an accounting. *Id.* (citing Tex. Prop. Code Ann. § 115.001(a)(6), (7), (8), and (9)). When such matters are related to a prior probate proceeding in a county court at law, both courts have concurrent jurisdiction over the matter. *Id.*

As noted by the court in *Peek I*, Linda's Trust Claim alleged that Bruce had breached his duties as the Peek Trust's trustee and (1) sought an accounting, (2) complained of Bruce's administration of trust assets, and (3) sought his removal as trustee of the PK Revocable Living Trust, which had been set up by Bruce and received assets improperly transferred from the Peek Trust. *Id.* Thus, the court concluded that "the Trust Claim could have been heard by the 271st District Court, or one of the county courts at law for Wise County if they were exercising original probate jurisdiction." *Id.* The record does not reflect that Linda amended her pleadings after the

7

El Paso Court of Appeals remanded the case.[5] Thus, her pleading at issue in *Peek I* is still her live pleading.

Bruce contends that we must disregard the substance of Linda's pleading and consider the "end result" to determine whether the trial court had subject-matter jurisdiction over the Trust Claim. According to Bruce, "[t]he 'end' guides this analysis, not the 'means,'" and the "end" is "the setting aside of Dorothy's will and the [county court at law's] distribution of estate assets." Thus, he argues the county court at law has exclusive jurisdiction over the Trust Claim. He cites *Stodder v. Evans*, 860 S.W.2d 651, 652 (Tex. App.—Waco 1993, writ denied) (op. on reh'g), as instructive to our analysis.

*Stodder* concerned an heir's attempt to contest a will outside of probate. *Id.* at 652. Jody Stodder alleged that she was the sole heir of Richard Stodder, who had been declared mentally incompetent before executing a will that was subsequently admitted to probate in county court. *Id.* Jody alleged that Randall Evans, who was Richard's guardian and the independent executor of Richard's will, knew that Richard lacked testamentary capacity to execute the will. *Id.* Jody asserted numerous claims against Evans and sought "an accounting[ ]and imposition of a constructive trust and equitable

---

[5]Linda was originally a defendant in this case, which was brought by Dorothy in 2012. Linda answered and filed a counterclaim alleging that Bruce had breached his fiduciary duties as the Peek Trust's trustee by unduly influencing Russell and Dorothy "to amend the trust, and ultimately to terminate the trust, to remove all other beneficiaries except for himself and to transfer all of the trust property, ultimately, to the PK Revocable Living Trust, a self-made trust by Gary Bruce Peek and his counsel." After the first remand, the parties were realigned, and Linda was named a plaintiff.

8

lien on the estate's assets," but she did not expressly request that the will be set aside for fraud or lack of testamentary capacity. *Id.* Although Jody mailed her petition to the county clerk, it "was somehow filed in the district court instead." *Id.*

On appeal from the trial court's summary judgment dismissing Jody's claims, the appellate court had to determine whether Jody's suit asserted a will contest. *Id.* at 652–53. The court observed that if Jody's pleading could be construed as a will contest, the district court lacked subject-matter jurisdiction. *Id.* The court noted that Jody had explicitly alleged lack of testamentary capacity and Evans's fraud, deception, and misrepresentation in probating the will. *Id.* at 653. The court also noted Jody's failed attempt to file her petition with the court that presided over the probate proceeding. *Id.*

Although Jody had not expressly sought to set aside the will, the court concluded that it could "supply the missing averment by inference because it is clearly implied by what is alleged." *Id.* (citing *Roark v. Allen*, 633 S.W.2d 804, 809 (Tex. 1982)). Specifically, the court found that

> [c]onstruing the pleading as including a will contest harmonizes with the specific allegation that heirs at law are determined at the time a will is set aside, with requests for a constructive trust and equitable lien on the estate's assets, and with the prayer that the court order Evans to convey the estate's assets to Jody as [Richard's] sole heir at law.

*Id.* The court further noted that "[a] constructive trust on and conveyance of specific assets would be possible and necessary only if [Jody] were entitled to possession, and she would have no right of possession unless the will were first set aside through a will contest." *Id.* Thus, the court concluded that the suit included a will contest. *Id.*

9

We disagree with Bruce's contention that *Stodder* supports an "ends-based" analysis. Although the *Stodder* court mentioned that the appellees had asserted in their summary-judgment motion that Jody's "request for possession of the estate's assets is equivalent to requesting that the will be set aside," *id.*, this did not control the court's decision. Rather, the court's analysis focused on what was "clearly implied by what [was] alleged." *Id.* The court pointed to the appellee's assertion as consistent with its own conclusion that Jody could seek the requested relief only if she were an heir and the will were set aside. *Id.* Here, Linda's Trust Claim was not dependent on such an outcome. Moreover, all of the claims in *Stodder* concerned Evans's allegedly tortious acts in probating Richard's will or as the estate representative. *Id.* at 652. There was no trust or prior testamentary instrument. *Id.* In contrast, Linda's Trust Claim focused solely on Bruce's alleged actions related to the Peek Trust and did not concern his probating Dorothy's will or acting as her estate representative.[6]

Linda's Trust Claim alleged that the Peek Trust "was amended to remove [Linda] as a beneficiary, [and] the assets of the trust transferred to Dorothy Peek." She also asserted that Bruce had "violated his duties to the beneficiaries as trustee of [the Peek Trust]." She expressly sought an accounting of all assets taken from the Peek Trust,

---

[6]Linda's Will Claim is more akin to the *Stodder* claim. Specifically, Linda alleged that Bruce and his counsel "made a new will for [Dorothy] that expressly disinherited [Linda]," "took all actions necessary, using undue influence over Dorothy Peek . . . to take for themselves the substantial and very valuable estate," and engaged in a joint enterprise to use "undue influence over Dorothy Peek to change her will to disinherit Linda."

recovery of "all financial gain received by [Bruce] from the [Peek] Trust while he was Trustee," and "restor[ation of] all property removed from the [Peek] Trust." Her Trust Claim contained no heirship allegations, unlike the *Stodder* allegations.

Bruce also cites *In re Hannah*, 431 S.W.3d 801, 808 (Tex. App.—Houston [14th Dist.] 2014, orig. proceeding) (per curiam), to support his "ends-based" proposition. Yet *Hannah* contradicts his position. The relator in *Hannah* sued in district court for tortious interference with an inheritance, slander, and conspiracy alleging that defendants had interfered with the decedent's bequest to relator. *Id.* at 804–05. The relator did not contest the probate of the will, but she alleged that prior wills had bequeathed significant assets to her. *Id.* at 804. On petition for writ of mandamus from the trial court's transfer of the case to the county court at law, the appellate court concluded that relator's claims did not qualify as a probate proceeding because they did not contest property distribution under a probated will but, rather, alleged slander and tortious interference with decedent's prior wills. *Id.* at 808. The court concluded, "Although the gravamen of relator's suit is that relator was disinherited as a result of the defendants' alleged actions, that fact alone is insufficient to make her suit a probate proceeding." *Id.*

Linda contends that she does not contest Dorothy's will. She notes, and we agree, that the trial court did not address the validity of Dorothy's will. Indeed, the validity of a will is not dependent on the assets that would be distributed under that will. *See In re Estate of Arrington*, 365 S.W.3d 463, 466–67 (Tex. App.—Houston [1st Dist.] 2012, no

11

pet.) (discussing requirements to admit a will to probate under version of Probate Code applicable to probate of Dorothy's will). In other words, the validity of the will has no bearing on the relief sought in the Trust Claim. Like the claims in *Hannah*, Linda's Trust Claim concerns only Bruce's alleged interference with her beneficiary interest in the Peek Trust, and her allegation that she was disinherited because of his alleged actions is insufficient to make the Trust Claim a probate proceeding. *See Hannah*, 431 S.W.3d at 808. Moreover, Bruce's "ends-based" analysis would absurdly deprive district courts of jurisdiction to hear cases contesting title to property distributed under a will. *See, e.g., Gordon v. Jones*, 196 S.W.3d 376, 381–82 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (holding district court had subject-matter jurisdiction over heir's trespass-to-try-title action alleging fraud in probate of decedent's will).[7]

In *Peek I*, the El Paso Court of Appeals found three distinct claims and concluded that the trial court had concurrent jurisdiction over the Trust Claim. *Peek I*, 546 S.W.3d at 256–57, 265 (citing Tex. Prop. Code Ann. § 115.001(a)). We cannot disturb this

---

[7]Bruce cites other cases to support his "ends-based" proposition. These cases are either inapplicable to the facts at issue or undercut his proposition. *See Storm v. Storm*, 328 F.3d 941, 948 (7th Cir. 2003) (holding Supreme Court precedent barred federal district court from hearing pre-probate claim for tortious interference with inheritance expectancy), *abrogated by Marshall v. Marshall*, 547 U.S. 293, 311, 126 S. Ct. 1735, 1748 (2006) (concluding *Storm* court erroneously interpreted prior authority to withhold federal court jurisdiction over matter "well beyond probate of a will or administration of a decedent's estate"); *Narvaez v. Powell*, 564 S.W.3d 49, 58 (Tex. App.—El Paso 2018, no pet.) (holding that claims for and arising from alleged improper payment of attorney's fees from estate property were probate proceedings under Section 31.001 of the Texas Estates Code).

ruling, *see Wohlfahrt v. Holloway*, 172 S.W.3d 630, 637–38 (Tex. App.—Houston [14th Dist.] 2005, pets. denied) (reasoning that law-of-the-case doctrine applied to disputed holding from a different court of appeals when appellant provided "no argument regarding changed issues or facts"), and we overrule Bruce's first issue.

## B. The Receiver's Appointment

In his second issue, Bruce contends the evidence is legally and factually insufficient to support the receiver's appointment over the Peek Trust because (1) Dorothy dissolved the Peek Trust and the trial court has not issued a new order to "resurrect" it;[8] (2) res judicata bars the receiver's appointment; and (3) the evidence is insufficient to prove that Bruce breached his fiduciary duties as trustee and unduly influenced Dorothy to transfer assets from the Peek Trust.

### 1. Standard of Review

In a trial to the court in which no findings of fact or conclusions of law are filed, such as here, the trial court's judgment implies all findings of fact necessary to support it. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017). When a reporter's record is filed, these implied findings are not conclusive, and an appellant may challenge them by raising issues challenging the legal and factual sufficiency of the evidence to support the judgment. *Id.* We apply the same standard when reviewing the sufficiency

---

[8]Bruce's brief discusses this point separately from his two issues. He does not indicate how the point fits into his issues or request relief on this point. We interpret it as an additional ground for this second issue and will address it as such.

of the evidence to support implied findings that we use to review the evidentiary sufficiency of jury findings or a trial court's express findings of fact. *Id.* We must affirm the judgment if we can uphold it on any legal theory supported by the record. *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766–67 (Tex. 2011).

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge— only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018). In determining whether legally sufficient evidence supports the challenged finding, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn*, 554 S.W.3d at 658 (quoting *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017)).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635

14

(Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### 2. Analysis

#### a. Dissolution of the Peek Trust

Bruce contends that Dorothy dissolved the Peek Trust before her death and that our judgment in *Peek II* vacated the trial court's Interim Judgment that "resurrected" the Peek Trust. According to Bruce, Dorothy dissolved the trust by transferring its assets, and it remains dissolved because the trial court did not reissue its order resurrecting the trust by voiding Dorothy's asset transfers.

The evidence of the asset transfers and the trust provisions implicated in this issue is undisputed. Thus, we review this issue de novo. *See Reliance Nat'l Indem. Co. v. Advance'd Temporaries, Inc.*, 227 S.W.3d 46, 50 (Tex. 2007) (noting appellate courts review legal determinations de novo and concluding "[w]hat might otherwise be a question of fact becomes one of law when the fact is not in dispute or is conclusively established").

At trial, copies of three special warranty deeds were admitted as evidence of the transfers at issue. The deeds were executed by Dorothy and Bruce as trustees on April 9, 2012, and conveyed three tracts of real property identified as all or part of "Block 22" and "Block 40" of the "Smith County School Land Survey, Abstract No. 744" from the Peek Trust to Dorothy. Copies of the trust documents and amendments admitted into evidence reflected that the Peek Trust would terminate if all income and principal were paid out. Bruce testified that the April 9, 2012 deeds transferred all of the real

15

property in the Peek Trust to Dorothy. Thus, he contends that Dorothy dissolved the trust in 2012.

Each deed, however, reserved "all oil, gas, and mineral rights." An October 18, 2010 Assignment of Oil, Gas and Mineral Lease admitted at trial reflects an assignment of Russell and Dorothy's "rights, title, and interest in and to the Oil, Gas, and Mineral Lease[s]" on Blocks 22 and 40 *to* the Peek Trust. A December 31, 2018 Assignment of Oil, Gas and Mineral Lease also admitted at trial reflects an assignment of "rights, title, and interest in and to the Oil, Gas, and Mineral Lease[s]" on Blocks 22 and 40 *from* the Peek Trust to Bruce's PK Trust. Thus, contrary to Bruce's contention, as late as December 2018—six years after Dorothy's death—assets remained in the Peek Trust.

The trust documents and amendments also reflect that the trust would become irrevocable "[u]pon the death of the first of [Russell or Dorothy] to die." Dorothy predeceased Russell on November 20, 2012. Bruce testified that the Peek Trust became irrevocable on Dorothy's death and that he was still the trustee at the time of trial in February 2020.

The record reflects that the April 2012 asset transfers did not dissolve the Peek Trust by transferring all trust assets. At least one asset remained in the trust until December 2018 and Bruce was still the trustee in 2020. Accordingly, the trial court's Interim Judgment did not "resurrect" the Peek Trust, and we need not address Bruce's contention that our *Peek II* judgment vacated that aspect of the trial court's judgment. *See* Tex. R. App. P. 47.1

16

**b. Res Judicata**

Bruce next contends that res judicata barred the trial court from considering undue-influence evidence because the same evidence was addressed by the county court at law when Dorothy's will was admitted to probate.

Res judicata generally encompasses two categories of a prior judgment's preclusive effects: (1) issue preclusion, or collateral estoppel, and (2) claim preclusion, or res judicata. *Barr v. Resol. Tr. Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 628 (Tex. 1992). Collateral estoppel precludes relitigating issues resolved in a prior suit, and res judicata precludes relitigating claims that were finally adjudicated or that arise out of the same subject matter and should have been litigated in a prior suit. *Id.*

According to Bruce, the county court at law's order admitting Dorothy's will to probate is a final judgment on the question of his undue influence over Dorothy. Undue influence, however, affects only one element of Linda's breach-of-fiduciary-duty claim. *See Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 703 (Tex. App.—Fort Worth 2018, pet. denied) (outlining the three elements of a breach-of-fiduciary-duty claim). Thus, the question is whether this issue was addressed by the county court at law in the probate proceeding, not whether the order admitting the will to probate barred Linda's breach-of-fiduciary-duty claim. *See id.*

Collateral estoppel bars an issue if:

(1) the facts sought to be litigated in one action were fully and fairly litigated in a prior action; (2) those facts were essential to the judgment in the prior action; and (3) the parties were cast as adversaries in the prior

17

> action or the party against whom collateral estoppel is being asserted was a party to the prior litigation or is in privity with such a party.

*Resurgence Partners, LLC v. Urbach*, No. 02-21-00418-CV, 2023 WL 2033945, at *8 (Tex. App.—Fort Worth Feb. 16, 2023, no pet.) (mem. op.) (quoting *Lavely v. Heafner*, 976 S.W.2d 896, 899 n.4 (Tex. App.—Houston [14th Dist.] 1998, no pet.)).

As previously discussed, the El Paso Court of Appeals found three separate claims at issue in this case: the Guardianship Claim, the Will Claim, and the Trust Claim, *see Peek I*, 546 S.W.3d at 256–57, and we cannot disturb that ruling, *see Wohlfahrt*, 172 S.W.3d at 637–38. Only the Trust Claim remains at issue in this case, and Bruce has not directed us to any evidence showing that the facts alleged in the Trust Claim were either addressed in the prior probate proceeding or essential to admit Dorothy's will to probate. *See Resurgence Partners*, 2023 WL 2033945, at *8.

Although Bruce contends that the undue-influence evidence was presented in the probate proceeding, he identifies only that the county court at law found that Dorothy had the requisite testamentary capacity to execute the will. He points to no ruling on undue influence. Indeed, the county court at law's order admitting Dorothy's will to probate states only that the will was properly executed, self-proved, and not revoked. *See Arrington*, 365 S.W.3d at 466–67.

Testamentary capacity and undue influence are two separate issues. *See Rothermel v. Duncan*, 369 S.W.2d 917, 922 (Tex. 1963) ("Undue influence in the procurement of a testament is a ground for its avoidance separate and distinct from the ground of

testamentary incapacity; for while testamentary incapacity implies the want of intelligent mental power, undue influence implies the existence of a testamentary capacity subjected to and controlled by a domina[n]t influence or power."); *see also Estate of Luce*, No. 02-17-00097-CV, 2018 WL 5993577, at *11 (Tex. App.—Fort Worth Nov. 15, 2018, no pet.) (mem. op.) (quoting *Rothermel*). Additionally, undue influence over Dorothy's will could be raised only in a will contest, *see Rothermel*, 369 S.W.2d at 922 ("The burden of proving undue influence is upon the party contesting [the testament's] execution."), and the Trust Claim does not present a will contest, *see Peek I*, 546 S.W.3d at 256–57.

Bruce notes in his appellate brief that Linda filed a will contest in the county court at law in 2014 but that she did not pursue it, "and the County Court at Law never acted upon it." Copies of filings from the probate and guardianship proceedings that were admitted at trial include Linda's will-contest petition, but they do not contain any ruling on the petition or any indication that the county court at law addressed it. Even if it had been addressed, it would have no preclusive effect on the Trust Claim, which is separate and distinct from the Will Claim. *See id.* Thus, neither res judicata nor collateral estoppel barred the trial court from hearing the Trust Claim.

### c. Evidence

Bruce contends that the evidence presented at trial was not only legally and factually insufficient to show that he breached any fiduciary duty and unduly influenced

19

Dorothy to transfer trust assets in April 2012 but also that "the evidence contravenes" any such finding.

### i. Applicable Law

Although Linda did not plead specific statutes in support of her allegation that Bruce breached his fiduciary duties as the Peek Trust's trustee, she submits two statutes on appeal: Chapter 64 of the Texas Civil Practice and Remedies Code and Section 114.008 of the Texas Property Code. Because it is dispositive, we address only the appointment of the receiver under the Texas Property Code. *See* Tex. R. App. P. 47.1.

"High fiduciary standards are imposed upon trustees, who must handle trust property solely for the beneficiaries' benefit." *Moody Nat'l Bank v. Moody*, No. 14-21-00096-CV, 2022 WL 14205534, at *7 (Tex. App.—Houston [14th Dist.] Oct. 25, 2022, pet. denied) (mem. op.) (quoting *Ditta v. Conte*, 298 S.W.3d 187, 191 (Tex. 2009), and citing Tex. Prop. Code Ann. §§ 113.051–115.059). "A trustee owes an unwavering duty of good faith, fair dealing, loyalty, and fidelity to the trust's beneficiaries when managing the affairs of a trust and its corpus." *Id.* (first citing Tex. Prop. Code Ann. §§ 113.051–.058; then citing *Harrison v. Reiner*, 607 S.W.3d 450, 462 (Tex. App.—Houston [14th Dist.] 2020, pet. denied); and then citing *Ludlow v. DeBerry*, 959 S.W.2d 265, 279 (Tex. App.—Houston [14th Dist.] 1997, no writ)). A trustee also has a duty to fully disclose all material facts known to the trustee that might affect the beneficiaries' rights. *Id.* (citing *Huie v. DeShazo*, 922 S.W.2d 920, 923 (Tex. 1996) ("The trustee's duty of full disclosure extends to all *material facts* affecting the beneficiaries' rights.")); *see also* Tex.

20

Prop. Code Ann. § 113.151(a) (requiring trustee to account to beneficiaries for all trust transactions). Subject to exceptions not applicable here, a trustee must also avoid self-dealing with trust assets. Tex. Prop. Code Ann. § 113.053(a).

A trustee commits a breach of trust when he breaches his statutory or common law fiduciary duties. *Id.* §§ 113.051, 114.001(b), (c); *see also Brault v. Bigham*, 493 S.W.2d 576, 578–79 (Tex. App.—Waco 1973, writ ref'd n.r.e.) ("A trustee commits a breach of trust not only where he violates a duty in bad faith, or intentionally although in good faith, or negligently, but, also where he violates a duty because of a mistake.").

> To succeed on a breach-of-fiduciary-duty claim, a plaintiff must establish, "(1) a fiduciary relationship between the plaintiff and defendant, (2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach."

*Severs*, 559 S.W.3d at 703 (quoting *Lindley v. McKnight*, 349 S.W.3d 113, 124 (Tex. App.—Fort Worth 2011, no pet.)).

To remedy a breach of trust, a trial court may appoint a receiver to take possession of trust property and administer the trust. Tex. Prop. Code Ann. § 114.008(a)(5).[9]

The rules that guide an undue-influence determination "apply substantially alike to wills, deeds, and other instruments." *Wils v. Robinson*, 934 S.W.2d 774, 780 (Tex.

---

[9]Section 64.001(a) of the Texas Civil Practice and Remedies Code permits a trial court to appoint a receiver in certain circumstances inapplicable here or "in any other case in which a receiver may be appointed under the rules of equity." Tex. Civ. Prac. & Rem. Code Ann. § 64.001(a).

21

App.—Houston [14th Dist.] 1996), *writ granted, judgm't vacated w.r.m.*, 938 S.W.2d 717 (Tex. 1997); *see also Rothermel*, 369 S.W.2d at 922 (relying on, among other precedent, *Curry v. Curry*, 270 S.W.2d 208, 213 (Tex. 1954), for undue-influence analysis involving deed execution). To determine whether there has been undue influence, we consider (1) whether an influence existed and was exerted; (2) whether the influence operated to subvert or overpower the person's mind when executing the document; and (3) whether the person would have executed the document but for the influence. *Wils*, 934 S.W.2d at 780. This is a fact-intensive inquiry, and courts generally consider the following factors:

- the circumstances surrounding execution of the instrument;

- the relationship between the grantor and the grantee;

- the motive, character, and conduct of the persons benefitted by the instrument;

- the participation by the beneficiary in the preparation or execution of the instrument;

- the words and acts of the parties;

- the interest in and opportunity for the exercise of undue influence;

- the physical and mental condition of the grantor at the time of the instrument's execution, including the extent to which she was dependent upon and subject to the control of the grantee; and

- the improvidence of the transaction by reason of unjust, unreasonable, or unnatural disposition of the property.

*Pulido v. Gonzalez*, No. 01-12-00100-CV, 2013 WL 4680415, at *3 (Tex. App.—Houston [1st Dist.] Aug. 29, 2013, no pet.) (mem. op.) (first citing *Pearce v. Cross*, 414 S.W.2d 457, 462 (Tex. 1966); and then citing *Guthrie v. Suiter*, 934 S.W.2d 820, 831 (Tex. App.—Houston [1st Dist.] 1996, no writ)).

"The person challenging the validity of an instrument generally bears the burden of proving the elements of undue influence by a preponderance of the evidence." *Estate of Klutts*, No. 02-18-00356-CV, 2019 WL 6904550, at *3 (Tex. App.—Fort Worth Dec. 19, 2019) (mem. op.) (first citing *Quiroga v. Mannelli*, No. 01-09-00315-CV, 2011 WL 944399, at *5 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, no pet.) (mem. op.); and then citing *Rothermel*, 369 S.W.2d at 922), *withdrawn pursuant to settlement*, No. 02-18-00356-CV, 2020 WL 1646581 (Tex. App.—Fort Worth Apr. 2, 2020, no pet.) (mem. op.). "[I]n situations involving self-dealing in fiduciary or confidential relationships, a presumption of unfairness arises that shifts both the burden of production and the burden of persuasion to the fiduciary seeking to uphold the transaction." *Klutts*, 2019 WL 6904550, at *5 (citing *Stephens Cnty. Museum, Inc. v. Swenson*, 517 S.W.2d 257, 260 (Tex. 1974) (observing that when a fiduciary relationship existed between sisters and their brother, who was operating under their power of attorney and who was also a director of the museum to which the sisters had made a contribution that they later sought to set aside, "[u]nder such conditions, equity indulges the presumption of unfairness and invalidity, and requires proof at the hand of the party claiming validity and benefits of the transaction that it is fair and reasonable")).

### ii. Breach-of-Fiduciary-Duty Evidence

The record reflects that Dorothy and Russell had made many changes to the Peek Trust beneficiaries' shares over the years. At trial, the witnesses expressed some confusion about the latest amendment to the trust. The record reflects, however, that Dorothy filed a petition to modify the Peek Trust on November 15, 2012—five days before she died—to give herself the sole right to revoke and amend the trust. The petition indicates that the final amendment to date was the fourth amendment, dated October 18, 2010. The fourth amendment does not appear in the record, but testimony and other evidence indicates that it removed Latshaw as trustee. Linda asserts that the third amendment, dated May 19, 2010, was the last to alter the trust beneficiaries' distribution percentages. Bruce does not dispute this assertion. The third amendment requires the trustee to distribute the remaining trust property "[a]s soon as practicable after the death of the survivor" as follows:

| Name | Relationship | Share |
| --- | --- | --- |
| Gary Bruce Peek | Son | 25.5% |
| Linda P. Mayfield | Daughter | 22.5% |
| Allen L. Latshaw | Grandson | 21.5% |
| Lainie K. Latshaw | Granddaughter | 24.5% |
| Bryan G. Peek | Grandson | 6.0% |

Russell died on May 12, 2014. No evidence was presented at trial of any distributions after Russell's death except for Bruce's December 31, 2018 assignment of "all of [the Peek Trust's] rights, title, and interest in and to the Oil, Gas, and Mineral Lease[s]" on Blocks 22 and 40 to his PK Trust. Bruce was the sole remaining trustee at

that point. This self-dealing transaction gave rise to an unfairness presumption, and Bruce had the burden to prove otherwise. *See id.* The record does not reflect any evidence addressing this presumption or showing that Bruce redistributed the transferred interest to the Peek Trust's beneficiaries. This evidence alone is sufficient to constitute a breach of fiduciary duty. *See* Tex. Prop. Code Ann. § 113.053(a); *Brault*, 493 S.W.2d at 578–79.

The record also reflects that Bruce failed to disclose to the trust beneficiaries both this self-dealing transaction and the April 2012 property transfers that Bruce and Dorothy had signed as co-trustees. Specifically, Linda testified that she had received no information from Bruce about any of the transactions, and Latshaw testified that Bruce had not communicated with her since she was removed as trustee and that she was unaware that Bruce and Dorothy had transferred property from the Peek Trust in April 2012. Bruce offered no evidence to rebut these allegations but testified that he did not know what was in the April 2012 deeds that he signed. The trial court was free to weigh this evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (holding the factfinder is the sole judge of the credibility of the witnesses and the weight to be given to their testimony). Evidence of Bruce's failure to disclose material facts affecting the trust beneficiaries' rights is also sufficient to constitute a breach of fiduciary duty. *See Moody*, 2022 WL 14205534, at *7; *Brault*, 493 S.W.2d at 578–79.

### iii. Undue-Influence Evidence

The evidence regarding Bruce's alleged influence over Dorothy is mostly testimonial. As the sole judge of the credibility of the witnesses and the weight to be given to their testimony, the factfinder may believe one witness and disbelieve another and resolve inconsistencies in any testimony. *Golden Eagle Archery*, 116 S.W.3d at 761; *see also Figueroa v. Davis*, 318 S.W.3d 53, 60 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (citing *City of Keller*, 168 S.W.3d at 819–20). We may not substitute our judgment for that of the factfinder, even if the evidence would support a different result. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex. 1998).

As evidence that Dorothy's April 2012 transfers were not the result of undue influence, Bruce first cites Linda's and other family members' "consistent[] misuse[] [of] the gifts given them." He contends that Dorothy "consistently reacted" to the misuse "by limiting and, eventually, ceasing those gifts." He also notes the acrimony between himself and Linda and Linda's admission that Dorothy always favored him. As evidence of Linda's allegedly contentious relationship with Dorothy, he cites Linda's testimony that she called Dorothy by her first name instead of "mom," that she did not feel like Dorothy was her mother, and that she referred to Dorothy as "Evil Dorothy."

He also contends that there is no probative evidence that he exerted any improper influence over Dorothy or had sufficient control over the Peek Trust to self-deal. He cites the testimony of Christy Lee, who had been legal counsel for the trustees. Lee testified that Dorothy had made all trust decisions even though she was not the

sole trustee. Lee also testified that Dorothy had made her own decisions and was "very adamant about what she wanted to have happen[]." Although Lee testified on direct examination that there was no undue influence over Dorothy's decisions, on cross-examination she admitted that she could not say whether Bruce had ever influenced Dorothy's decisions, noting that she (Lee) "was not with Bruce often." Bruce also testified that he had not tried to influence Dorothy because "[t]hat wouldn't work."

Latshaw, Linda, and other witnesses told a different story. Latshaw testified that Bruce had been estranged from his parents until 2008. She said that Bruce did not come to Christmas gatherings and that Linda would pick up Bruce's children and bring them to the gatherings without him. She estimated that he had not attended the family gatherings for about 35 years because "that's about how long he and [Linda] had not been speaking to one another."

Latshaw also testified that Russell and Dorothy had limited their gifts to Linda because they did not approve of her husband but that they had set up a savings account for Linda and wanted their "homestead to go to Linda." A copy of the May 1, 2007 trust amendment corroborates this testimony. The amendment limited Linda's trust distributions to $4,000 per month out of concern for Linda's and her husband's spending habits and allocated the "family residence" to Linda upon Russell's and Dorothy's deaths.

Latshaw and Bruce became the Peek Trust's trustees in January 2010 when Russell and Dorothy resigned. Dorothy removed Latshaw as trustee in October 2010

when she suspected that Latshaw was attempting to increase Linda's trust distributions. Latshaw had been out of the country at the time and was told about the change only when she returned. She further testified that when she called to confirm that Dorothy had intended for Latshaw to resign, Dorothy said, "Bruce had told her --."[10]

Regarding Dorothy's mental condition, Latshaw testified that in 2011, Dorothy exhibited signs of dementia and was not able to "take care of the finances or do anything like that." She further noted that she had power of attorney over Russell and that Bruce had power of attorney over Dorothy.

Latshaw also testified that Bruce would comment that "life would be easier if [Russell were] gone and [Dorothy] could live life in peace." A private investigator that the family had hired to surveil the family residence in 2011 also testified that he had heard Bruce say that things would be much easier if Russell were dead. He also testified that Dorothy had struggled to remember her name during a court appearance in 2011.

April Geiger, a caregiver who was hired by the family in 2008, testified that she had seen Bruce at the house frequently, sometimes every day. Geiger described those times as tense and stated that when Bruce and Russell "saw each other, that was drama." She said that Bruce would talk with Dorothy in the bedroom and that afterward Dorothy would "be very upset," "wanted to be left alone," or "seemed upset and nervous and just fidgety."

---

[10]Bruce's trial counsel interjected, but did not object, before Latshaw could finish her sentence.

Geiger recounted an incident in which Dorothy had to go to the hospital. As it happened, a royalty check came in the same day. She said that Bruce had called Dorothy while she was at the hospital and said he was coming to get the royalty check. Dorothy told him not to, "got upset," and handed the phone to Geiger. Geiger told Bruce that "[t]hings aren't too good right now," and Bruce responded, "I'm coming up there. Her purse is there." She said that Bruce arrived and wanted his check and that "[t]here were some choice words, yelling, [and] security" when Russell arrived later. Geiger helped calculate Bruce's royalty share and wrote the check.

She also testified that Dorothy "did what she wanted to do, but she could -- I don't want to say persuaded, but she just, kind of, gets rattled, and I guess goes against what she wanted to do." Geiger also said that she had heard about "Bruce wanting to be in charge of the finances and stuff because of some issues that Russell had done."

Lauren Griffin, who was hired as a caregiver in August 2012, described Dorothy as "weak," "frail," and suffering from hallucinations in the last few months of her life. She also described Bruce's controlling behavior, specifically noting that Bruce prohibited anyone from coming to the house or the hospital to see Dorothy. She said that Bruce had prohibited her from telling family members when Dorothy was in the hospital, "even when [Dorothy] broke her hip." According to Griffin, Bruce had also prohibited her from telling anyone when Dorothy died.

She also said that Bruce was "[v]ery aggressive" with his parents and that Russell was afraid of him. According to Griffin, Russell would sometimes pretend to be asleep

29

when Bruce came in. When several caregivers abruptly quit after Bruce had allegedly berated them for bringing fast food into the house, Russell purportedly told Griffin, "Please, please find my daughter and tell her I love her and that I'm okay. Please find Linda." She further testified that although Dorothy had been described as someone who did what she wanted, "there was some influence there" and that "she was influenced by Bruce quite a bit." Griffin also said that during her time with the family, Bruce was in control of Dorothy's finances.

Mary Kay Luker, another caregiver who was hired in 2010, testified about Bruce's relationship with Russell and Dorothy. She said that Bruce was at the house at least once a day, sometimes two or three times a day, and he would call Dorothy every night before she went to bed. Luker testified that Dorothy was "very sharp" and "knew what she wanted." She also testified that Dorothy had said, "When I die[,] Bruce is going to have a fight on his hands with the family." According to Luker, Dorothy "didn't like the situation, but that's what she was dealing with."

Linda testified that she had a good relationship with Dorothy but that Dorothy favored Bruce. She echoed Latshaw's testimony that the family would gather with Russell and Dorothy every Christmas, that Bruce would not attend, and that she would bring Bruce's children. She also said that Bruce "couldn't stand" his parents and that he regularly said he "can't wait until they die." Bruce disputed that he ever wished either of his parents were dead or that he ever disrespected them.

Linda also confirmed Latshaw's testimony that Dorothy had reduced Linda's trust distributions and was putting the amount reduced in a savings account. According to Linda, Dorothy did not like Linda's husband's spending habits. She also clarified that she did not refer to her mother as "Dorothy" while she was alive but that she did not feel like Dorothy was her mother after she died. Linda also said that she was joking when she called Dorothy "Evil Dorothy" but that Dorothy "was very partial to Bruce, and that's her right if she wanted to be, but it -- it hurt me [a] lot."

Regarding the alleged discord between herself and Dorothy over squandering gifts, Linda testified that Russell and Dorothy had given her two acres near Russell and Dorothy's house. Despite her misgivings about living outside of town without a car, she and her husband had built a house on the property. A year later, they sold the property and moved into town because Linda felt that she was "stuck there with two children in diapers and without a car" and that she was "going to lose [her] mind if [she kept] doing this." She also testified that her parents had never given any indication that they would not leave her or her children anything when they died.

The record reflects conflicting evidence of Bruce's influence over Dorothy and of Dorothy's compromised mental and physical state in 2012. Specifically, trial testimony described Bruce as Dorothy's favorite child despite his early distant relationship with her, his sudden interest in Dorothy's well-being in her last few years of life, his strict control over the family's access to his parents at that time, his private consultations with Dorothy and her agitated responses, and his desire and opportunity

to control family finances. The conflicting testimony also described Dorothy as sharp and determined, yet forgetful and showing signs of dementia as early as 2011. Thus, there is some evidence that Bruce had motive and opportunity to unduly influence Dorothy to remove assets from the trust and that Dorothy was susceptible to his influence.

The testimony also reflects that although Dorothy had reduced Linda's trust distributions, she did so because of Dorothy's disdain for Linda's husband, not Linda. Indeed, some testimony indicated that Dorothy had retained the reductions in a savings account for Linda. Bruce offered no evidence to contradict this testimony. Thus, there is some evidence that Dorothy did not intend to eliminate Linda's share of the trust proceeds.

We conclude that the evidence is legally and factually sufficient to support the trial court's determination that Bruce committed a breach of trust, *see Gunn*, 554 S.W.3d at 658; *Pool*, 715 S.W.2d at 635, and we overrule Bruce's second issue.

### III.    Conclusion

Having overruled both of Bruce's issues, we affirm the court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Delivered: September 14, 2023